**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.** |
| | : | |
| **vs.** | : | |
| | : | |
| **IBRAHEM JOHNSON** | : | **25-368** |

**MEMORANDUM**

**Costello, J.**                                                                            **May 5, 2026**

Defendant Ibrahem Johnson faces various charges in connection with three armed robberies in Philadelphia between May and June of 2025.  Johnson moved to suppress certain evidence obtained when law enforcement officers stopped him shortly after the third robbery. Johnson argues that the officers lacked probable cause to stop and search him and that the seizure of this evidence therefore violated his rights under the Fourth Amendment to the United States Constitution.  Johnson's argument fails because officers had sufficient reasonable suspicion to stop him under the totality of the circumstances and then quickly developed sufficient probable cause for his arrest.  Accordingly, Johnson's motion is denied.

I.        **BACKGROUND**

A.        **The Police Flashes**

On June 11, 2025, at approximately 11:43 A.M., police received a 911 call about a robbery at a Family Dollar store on 58th Street and Woodland Avenue in Southwest Philadelphia. Ex. A at 11:4-24; *see also* Gov't Ex. 1.  Two minutes later, a flash was sent over police radio describing the suspect as an African-American male wearing all black clothing, with a black face mask, and about 5'5" in height.  Ex. A at 13:19-21.  The flash said the suspect fled on Woodland on foot in an unknown direction.  *Id.* at 44:9-12.

At 11:55 A.M., the responding officer to the scene provided additional information. *Id.* This flash indicated that the suspect was wearing a black hoodie, black ski mask, black sweatpants or track pants, black rubber crocs, and white socks. *Id.* at 13:13-17:19; 69:4-6; *see also* Gov't Exhibit 2. A few seconds later, officers reviewing Real Time Crime Cameras[1] followed up with another flash stating that it may be "a long shot," but it looks like the suspect may have been travelling westbound on foot then boarded a bus going northbound on 58th Street at 11:44 A.M. Ex. A at 54:4-55:8.

At 12:02 P.M., a Philadelphia police radio dispatcher received information from a SEPTA police dispatcher that a person matching the flash description got off the bus at 56th Street and Baltimore Avenue. *Id.* at 22:6-23:4; 46:6-9. At 12:05 P.M., the Philadelphia police radio dispatcher put out a flash stating "We are getting updates from SEPTA for the 58 and Woodland job. They said a male matching the flash just got off at 5-6 and Baltimore. Black male, black ski mask, all black clothing, black crocs, white socks." *Id.*; *see also* Gov't. Ex. 3.

**B.     The Initial Stop**

Philadelphia Police Officers Masoeli Musonge and Brandon Kubach were both on duty for separate police districts near 56th and Baltimore. Ex. A. at 11:1-7; *id.* at 100:8-101:16. Both were in marked police vehicles and in full uniform. *Id.* After hearing the 12:05 P.M. flash, Officers Musonge and Kubach started to independently surveil the 56th and Baltimore area. *Id.* at 22:25-23:4; 100:8-101:16. Officer Musonge observed Johnson in clothing matching the latest flash walking northbound on 700 South 57th Street. *Id.* at 24:4-21; 26:23-27:17. This location is a few blocks away (roughly a five to seven minute walk) from 56th and Baltimore Avenue,

---

[1] Real Time Crime cameras are cameras that are set up throughout Philadelphia and are monitored by police officers in real time. *Id.* at 20:3-5.

where the latest police flash placed the suspect getting off the bus. *Id.* at 64:3-12. Officer Musonge immediately made a U-turn to attempt to engage Johnson. *Id.* at 27:12-20. At 12:11 P.M., Officer Musonge broadcast over police radio that he observed an individual consistent with the flash description and indicated that he thought the suspect went down the 5700 block of Webster Street towards Alden. *Id.* at 29:22-30:17; *see also* Gov't Ex. 5. Officer Musonge exited his vehicle on Webster and Alden. Ex. A. at 28:18-25. Johnson looked back towards Officer Musonge then began to run. *Id.* at 28:18-25. Officer Musonge sent out a follow-up flash stating, "he is running." Gov't Ex. 5.

Hearing Officer Musonge's 12:11 P.M. flash, Officer Kubach responded in real time and drove to the other end of 5700 Webster Street. Ex. A at 101:1-7. Officer Kubach observed Johnson matching the flash information and activated his overhead light. *Id.* at 101:1-23. Johnson began to run into an alleyway. *Id.* After a short foot pursuit, Officer Kubach tackled and detained him. *Id.* at 102:1-9. Johnson was then handcuffed, at which point Officer Musonge removed a Nike cross-body bag from Johnson's torso. *Id.* at 84:24-85:7. While Officer Musonge was removing the bag, he felt a heavy object inside the bag. *Id.* at 85:4-8. While feeling around the outside of the bag, Officer Musonge felt what he believed to be the handle and barrel of a firearm. *Id.* at 33:7-12. Officer Musonge unzipped the bag and confirmed it contained a firearm. *Id.* at 34:7-14. While he began walking back to his patrol vehicle, the firearm accidentally fell out of the bag and hit the ground. *Id.* at 34:13-19; *see also* Gov't Ex. 6.

Another officer secured the firearm while Officer Musonge took the bag to a nearby patrol car and searched the remainder of the bag to ensure there were no additional weapons or other dangerous items inside. Ex. A at 35:15-36:8. While searching the bag, Officer Musonge found a wad of cash in one of the front zippered areas. *Id.* at 38:17-22. He also found

prescription drugs in an unmarked sandwich baggie. *Id.* at 39:1-6. The bag also contained marijuana. *Id.*

Officer Kubach and another officer walked Johnson to a patrol car and frisked him for any additional weapons.[2] As he was being frisked, Johnson stated: "Nothing on me. Everything is in the bag; everything is in the bag. Y'all got the bag—everything is in the bag; I don't have nothing on me." *Id.* at 138:19-24; *see also* Gov't Ex. 8. Officer Kubach then located a wad of cash in Johnson's pocket. Ex. A at 104:14-21. Johnson told Officer Kubach "Some of that is my actual money though." *Id.* at 105:6-14; Gov't Ex. 8.

While Officer Musonge and Officer Kubach were searching Johnson and his bag, another officer ran an NCIC/PCIC search to determine whether Johnson had a license to carry a firearm. Ex. A at 39:7-15. The search revealed that Johnson did not have a license and that the firearm found in Johnson's bag was reported stolen. *Id.* at 39:16-23.

At one point while he was handcuffed near one of the patrol vehicles, Johnson asked one of the officers, unprompted, "how bad is this?" The officer asked, "what is bad? What you did?" Johnson responded, "yeah." The officer responded, "yeah, you f*cked up." Johnson then responded, "yeah, I know I f*cked up. But is it like, years and decades bad?" Johnson then asked the sergeant, "am I fried serg?" The sergeant responded, "fried? What are you fried for?" Johnson then asked, "like, am I cooked for the charges y'all are about to drop on me?" The sergeant responded, "what are we about to drop on you?" Johnson responded, "I don't know . . . I want to know specifically the charges." Gov't Ex. 8.

---

[2] Officer Kubach testified at the suppression hearing that it is standard procedure to frisk an individual before they are placed in a police patrol car for the individual's and the officers' safety. *Id.* at 102:23-103:2.

At 12:33 P.M., a witness from the Family Dollar robbery was brought to the scene where Johnson was apprehended.  Ex. A at 94:7-95:4.  The witness positively identified Johnson as the person who robbed the store less than an hour prior.  *Id.*

Officers then transported Johnson to the Southwest Detective Division where he was arrested and provided with *Miranda* warnings by detectives.  ECF No. 37 at 6.  He made a statement to detectives admitting to having the cross-body bag but denied possessing the firearm.  *Id.*

The next day, law enforcement officers executed a search warrant for Johnson's home.  *Id.*  They recovered various items connected to the June 11 Family Dollar robbery and two other armed robberies Johnson was suspected of committing.  *Id.*

### C.    The Charges Against Johnson

On August 21, 2025, a grand jury in the Eastern District of Pennsylvania returned an indictment charging Johnson with three counts of robbery which interfered with interstate commerce in violation of 18 U.S.C. § 1951(a) (Counts One, Two, and Four).  The grand jury also returned charges against Johnson for using, carrying, and brandishing a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(ii) (Counts Three and Five), and being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g) (Count Six).

Count One charges Johnson with the armed robbery of a Family Dollar store in West Philadelphia on May 28, 2025.  Counts Two and Three charge Johnson with the armed robbery of a Rite Aid on June 8, 2025 in West Philadelphia.  Counts Four, Five, and Six charge Johnson with the June 11, 2025 armed robbery of the Family Dollar store in Southwest Philadelphia.

**D.    Johnson's Motion to Suppress**

      1.    <u>Johnson's Position</u>

Johnson moved to suppress (1) all items he had on his person at the time of his apprehension on June 11; (2) all items he had in the cross-body bag; (3) any eyewitness identification of Johnson as the perpetrator of the June 11 Family Dollar robbery; (4) all statements he made to law enforcement on June 11; and (5) evidence seized from his residence pursuant to a search warrant following his arrest.  ECF No. 32 at 1-2.

Johnson contends he was under custodial arrest at the moment that Officer Kubach and Officer Musonge encountered him on the street "because the officers restrained [his] liberty through physical force and a show of authority to which [he] submitted."  ECF No. 32-1 at 7-8. Therefore, according to Johnson, the officers needed, but did not have, probable cause to stop him.

Johnson makes three arguments as to why law enforcement lacked probable cause to arrest him.  First, Johnson argues that the flash information was unreliable because officers were uncertain about what the suspect did and where he went after leaving the Family Dollar.  ECF No. 32-1 at 2.  Second, he argues that there are critical factual inconsistencies between the arresting officers' statements, including the circumstances surrounding how the officers searched the bag to locate the firearm.  *Id.* at 4.  Third, Johnson argues that because the witness at the crime scene did not mention any kind of bag carried by the suspect, there was no reason for law enforcement to search his bag when they apprehended him.  *Id.* at 5-6.

In sum, Johnson's position is that "[t]here is nothing in the factual record to establish why it was reasonably trustworthy to believe the gunman got onto a bus and then got off of a bus at 56th and Baltimore[,] so the police had no knowledge of where the gunman went after the

robbery." *Id.* at 9. The seizure of everything after that initial faulty stop was, at best, "a guess," which falls short of probable cause. *Id.*

### 2.    The Government's Position

The Government responds that Johnson was "merely detained until the victim identified him," so his detention was short enough in duration that he was not under custodial arrest until that identification. ECF No. 37 at 14-15. Rather, this was a *Terry* stop supported by "'reasonable, articulable suspicion'" that criminal activity was afoot. *Id.* at 10 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). The Government argues that the arresting officers had reasonable suspicion to stop Johnson because his appearance matched the detailed flash description of the suspect and because of his geographic proximity to the location where the flashes placed the suspect. ECF No. 37 at 10-14. The evidence recovered pursuant to that stop was properly discovered through standard, lawful investigatory procedures. *Id.*

## II.    LEGAL STANDARD

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. A seizure occurs when a government actor, "by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). "To invoke the Fourth Amendment's exclusionary rule, a defendant must demonstrate that his own Fourth Amendment rights were violated by the challenged search or seizure." *United States v. Stearn*, 597 F.3d 540, 551 (3d Cir. 2010) (citing *Rakas v. Illinois*, 439 U.S. 128, 132-34 (1978)).

It is well-established that a law enforcement officer "may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable

7

suspicion that criminal activity is afoot." *Wardlow,* 528 U.S. at 123 (citing *Terry*, 392 U.S. at 30). A reasonable suspicion must be supported by "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." *Johnson v. Campbell*, 332 F.3d 199, 205 (3d Cir. 2003) (quoting *Terry*, 392 U.S. at 21). "The 'reasonable suspicion' necessary to justify such a stop 'is dependent upon both the content of information possessed by police and its degree of reliability.'" *Navarette v. California*, 572 U.S. 393, 397 (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)).

"The Supreme Court has not reduced 'reasonable suspicion' to a 'neat set of legal rules,' preferring instead a 'totality of the circumstances' approach focused on 'whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing.'" *United States v. Stevenson*, 832 F.3d 412, 429 (3d Cir. 2016) (citing *United States v. Arvizu*, 534 U.S. 266, 273-74 (2002)). "Suspicion must be based on more than a 'mere hunch' to be reasonable, but 'the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard.'" *Id.*

## III.    DISCUSSION

The record shows that the officers acted within the confines of the Fourth Amendment during their entire interaction with Johnson on June 11, 2025.

### A.    Reasonable Suspicion is the Applicable Standard

Johnson argues that he was arrested the moment officers Musonge and Kubach exited their vehicles on the 5700 block of Webster Street. ECF No. 32-1 at 7-8. He accordingly argues that the officers needed probable cause to detain him. *Id*. Johnson bases his argument on an incorrect legal standard.

An individual is "seized" under the Fourth Amendment when there has been an application of physical force or where the individual submitted to an officer's "show of authority" to restrain the individual's liberty. *California v. Hodari D.*, 499 U.S. 621, 626-27 (1991). Neither condition was present here when the officers exited their patrol vehicles.

When Officer Musonge saw Johnson on Webster Street, he did not have his patrol car lights or sirens on. Ex. A at 28:3-5. Nor did he brandish his weapon, threaten, command, or otherwise show force towards Johnson when he exited his vehicle. *Id.* at 29:7-21. When Johnson fled from Officer Musonge, Officer Kubach was on the other side of Webster Street with his lights activated. *Id.* at 75:4-9. Officer Kubach similarly did not brandish his weapon or threaten or command Johnson before or immediately after exiting his patrol vehicle. *Id.* at 101: 4-102:9. Thus, there is simply no evidence that either officer made a show of authority at this juncture. *See United States v. Drayton*, 536 U.S. 194, 203 (2000) (no show of authority where there "was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, [or] authoritative tone of voice").

### B.        Officers Had Reasonable Suspicion to Stop and Detain Johnson

Rather, law enforcement's initial encounter with Johnson is most accurately characterized as a brief investigatory stop. *See Wardlow,* 528 U.S. at 123. Officers Musonge and Kubach accordingly only needed to have "reasonable suspicion" that criminal activity was afoot at the time of the stop. *See id.* That standard is satisfied because the Government has pointed to "specific and articulable facts" supporting a rational inference that Johnson was the person suspected of committing the Family Dollar robbery at the time he was stopped. *See Terry*, 392 U.S. at 21.

A law enforcement officer's observation of an individual matching a recent physical description of a criminal suspect can constitute reasonable suspicion to conduct a *Terry* stop. *See United States v. Gardner*, 76 F. App'x 401, 403-04 (3d Cir. 2003) (similarity to flash description of suspect supports "particular and objective basis for believing that criminal activity was afoot"). When Officer Musonge spotted Johnson on the 5700 block of Webster Street, he observed that he matched the latest police flash describing the suspect. Namely, he observed that Johnson was an African-American male approximately 5'6" in height, dressed in all black clothing, black crocs, and white socks. Ex. A at 27:1-14; 69:4-6.

Geographic proximity can also support a finding of reasonable suspicion. *See Gardner*, 76 F. App'x at 403-04. Johnson argues that officers lacked a reasonable basis to stop him because he was two miles away from the Family Dollar store when he encountered Officers Musonge and Kubach. ECF No. 32-1 at 9. But it is not Johnson's proximity to the crime scene that is probative here. Rather, it is the location of Johnson vis-à-vis the latest flash information. The 12:05 P.M. flash indicated that the suspect may have gotten off a bus at 56th and Baltimore. *See supra* at 2-3. Officer Musonge first observed Johnson at 12:11 P.M. a few blocks away (about a 5-7 minute walk) from 56th and Baltimore. *Id*. Thus, Johnson was walking in the exact area where law enforcement had reason to believe the suspect would be, within a time frame it would take the average person to arrive there on foot.

Johnson makes much of the fact that the police flashes used qualifying language when conveying that the suspect may have boarded a bus going northbound and exited at 56th and Baltimore. *See, e.g.*, ECF No. 32-1 at 8 (emphasizing that the flash information stated that the armed robber "possibly" got on a bus but also "possibly" was lost in the area near the robbery); Ex. A at 130:9-17 (defense counsel emphasizing that the broadcast started with "this may be a

long shot"). The reliability of the information upon which law enforcement relies in making a *Terry* stop is relevant to the reasonable suspicion inquiry. *See Navarette*, 572 U.S. at 397 (reasonable suspicion necessary to justify *Terry* stop depends on content and reliability of information relied upon by law enforcement).

But the qualifiers used here do not render the flash information fundamentally unreliable. Officers responding in real time to suspected criminal activity must rely on information as they receive it and use their experience to figure out what to do with that information. Officers Musonge and Kubach were already patrolling the area near 56th and Baltimore on June 11, 2025. *See supra* at 2-3. Hearing the flash information that the suspect in the Family Dollar robbery "possibly" fled via bus to that area, the officers took the reasonable step of surveilling that location. *Id.* Once they were there, it was clear that Johnson matched the physical description of the suspect to a tee. *Id.* In other words, the facts on the ground matched the information in the flashes. Johnson's argument that the officers were not responding to "reasonably trustworthy information" when they encountered him on the 5700 block of Webster Street is therefore unavailing. ECF No. 32-1 at 8.

Courts in this Circuit have found that law enforcement had reasonable suspicion to conduct a *Terry* stop under similar circumstances. In *United States v. Coleman*, the Third Circuit affirmed the district court's finding that law enforcement had reasonable suspicion to detain two suspects based on their physical description and proximity to the crime scene. 300 F. App'x 164, 165-66 (3d Cir. 2008). Law enforcement received police flash information describing an African-American female wearing a pink shirt and an African-American male traveling in a black Lexus sedan with tinted windows. *Id.* at 166. An officer spotted the defendant's black sedan with tinted windows within minutes of hearing the flash "in proximity to the robbery

11

scene." *Id.* When the officer approached the vehicle, the officer observed an African-American male in the driver's seat and an African-American female in the passenger seat wearing a pink shirt. *Id.* The court concluded that law enforcement "had the reasonable suspicion required for a brief detention." *Id.*

Similarly, in *United States v. Gardner*, a law enforcement officer drove toward the location of an armed robbery reported over police radio. 76 F. App'x at 403. Less than ten minutes after the robbery, the officer saw the defendant driving away from the scene. The driver matched the description of the suspect disseminated through a police radio flash—an African-American male wearing a white shirt with a particular hair style and who appeared to be tall based on his stature in the car seat. *Id.* The court concluded that, "[g]iven the proximity in space and time to the scene of the crime" and the "similarity to the description broadcast," the officer "had a particular and objective basis for believing that criminal activity was afoot." *Id.*

Finally, upon observing Officers Musonge and Kubach, Johnson attempted to flee. *United States v. Acosta*, 751 F. App'x. 201, 202-03 (3d. Cir. 2018) (considering unprovoked flight in connection with other specific facts under "totality of the circumstances" test for reasonable suspicion). Johnson contests that he fled at all, arguing at the hearing on this motion that he only took a few steps down a side street for a couple of seconds before being tackled by Officer Kubach. Ex. A at 131:17-132:11. Regardless of how far or how long Johnson purportedly fled, the fact that he travelled in the opposite direction at the mere sight of law enforcement provides additional support for a finding of reasonable suspicion here. *See Wardlow*, 528 U.S. at 125 (unprovoked flight probative of reasonable suspicion because "[f]light, by its very nature, is not 'going about one's business'").

Given the totality of the circumstances, Officers Musonge and Kubach had reasonable suspicion to stop Johnson.  Like in *Coleman* and *Gardner*, Johnson's proximity to the last reported location of the suspect, plus the fact that his physical attributes and clothing exactly matched the description in the flashes, constituted "specific and articulable facts" supporting a "reasonable suspicion" that he was the robbery suspect.  *See Terry*, 392 U.S. at 21.  Johnson's subsequent attempt to flee from Officer Kubach only added to that suspicion.  *See Acosta*, 751 F. App'x at 203.  Law enforcement therefore acted lawfully when they conducted the *Terry* stop.

### C.    The Subsequent Searches and Seizures Were Lawful

Johnson also argues that the evidence collected pursuant to the *Terry* stop should be suppressed.  *See* ECF No. 32-1 at 1.

It is well-settled that, during a *Terry* stop, officers may conduct a reasonable search for weapons where there is reason to believe the individual is armed and dangerous.  *Terry*, 392 U.S. at 27; *United States v. Edwards*, 53 F.3d 616, 618 (3d. Cir. 1995) ("[A] police officer, during the course of a *Terry* stop, may conduct a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual.").  Probable cause is not required.  *Id.*

Johnson was stopped on suspicion of committing an armed robbery.  *See supra* at 1-3. Officers Musonge and Kubach had reason to believe he was armed and searched Johnson accordingly.  *See Edwards*, 53 F.3d at 618.  Officer Musonge had additional reason to believe Johnson was armed when he removed the cross-body bag and felt what he believed to be the barrel and handle of a firearm.  *See supra* at 3.  That belief was confirmed when he unzipped the bag and located a firearm.  *Id.*

13

Having already located one weapon, it was reasonable for Officer Musonge to continue to search the cross-body bag for additional weapons. *Id.*; *see also Terry*, 392 U.S. at 27 ("the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger"). During the search of the bag, Officer Musonge found marijuana and unauthorized prescription medications. *See supra* at 3-4. The discovery of unlawful drugs provided sufficient probable cause for Johnson's arrest. *See* Ex. A at 40:5-7. However, the Officers took the eminently reasonable step of continuing their brief investigatory stop to gather more information to confirm whether Johnson was involved with the robbery.

Consistent with standard procedure, Officer Kubach then frisked Johnson to ensure he could be safely placed in a patrol vehicle. *See supra* at 4 n.2; *see also Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993) (*Terry* stop may include "a patdown search to determine whether the person is in fact carrying a weapon") (internal quotations omitted); *United States v. Scott*, 816 F. App'x 732, 738 (3d Cir. 2020) (under *Terry*, officers were permitted to frisk defendant before placing him in police vehicle while waiting for victim to be brought to scene for an identification). It was during this frisk that Officer Kubach located an additional wad of cash and Johnson made incriminating statements that some of that money was his "actual money." *See supra* at 4. These facts increased the officers' suspicion that Johnson was involved in the robbery.

While Officers Musonge and Kubach were searching Johnson and his cross-body bag, another officer confirmed that Johnson did not have a license to carry a firearm and that the firearm recovered from the bag was stolen. *See supra* at 4. Johnson's unlawful possession of a stolen firearm provided another independent basis for probable cause to arrest him. Ex. A at 39:24-40:4. But again, the officers elected to wait until the witness from the Family Dollar could

14

be brought to the scene to make an identification.  *Id.*  And it was during this brief waiting period that Johnson made additional incriminating statements, including asking the officers whether he was going to face "charges."  *See supra* at 4; Gov't Ex. 8.

While a *Terry* stop does not permit law enforcement to keep a suspect detained for a lengthy period of time, they are able to "diligently pursue[] a means of investigation that [is] likely to confirm or dispel their suspicions quickly" and may detain a suspect as necessary during that investigation.  *United States v. Sharpe*, 470 U.S. 675, 686 (1985).  That is exactly what happened here.

This entire sequence of events unfolded over the course of a 21-minute time span.  *See* ECF No. 37 at 16 (explaining that Johnson was detained at 12:12 P.M., and the victim identified Johnson as the perpetrator at 12:33 P.M.); *see also* Ex. A 138:12-18.  During that short timeframe, the law enforcement officers on the scene conducted basic investigatory searches and frisks that were necessary to confirm or dispel their suspicions that Johnson was armed and dangerous and potentially the perpetrator of the Family Dollar robbery.  *See Sharpe*, 470 U.S. at 686.  At each step, the officers found more information connecting Johnson to the crime—the weapon, the money, the statements—until he was positively identified by a witness and finally arrested.

The Court finds that Johnson's brief detention under these circumstances was reasonable and that law enforcement was "diligent in accomplishing the purpose of the stop as rapidly as possible."  *See Baker v. Monroe Township*, 50 F.3d 1186, 1192 (3d. Cir. 1995) (citing *Sharpe*, 470 U.S. at 685-86).  Johnson's motion to suppress the evidence obtained in connection with this stop is denied.  *See United States v. Robinson*, 821 F. App'x 141, 142-44 (3d Cir. 2020) (denying

motion to suppress evidence obtained during 30-minute detention pending identification of defendant by victim).

## IV.    CONCLUSION

The evidence Johnson seeks to suppress was obtained pursuant to a lawful investigatory stop.  At no point did law enforcement run afoul of the Fourth Amendment.  Johnson's motion is therefore denied.

BY THE COURT

MARY KAY COSTELLO
United States District Judge